1
2
3
4
5
6
7         **UNITED STATES DISTRICT COURT**

8         **DISTRICT OF NEVADA**

9

10    KIMBERLY BROWN,

11         Plaintiff,                          Case No. 2:12-cv-02087-LDG (PAL)

12    v.                                       <u>ORDER, FINDINGS OF FACT,</u>
                                               <u>CONCLUSIONS OF LAW</u>
13    LIFE INSURANCE COMPANY OF
      NORTH AMERICA,
14
           Defendant.
15

16

17

18         The plaintiff, Kimberly Brown, sues the defendant, Life Insurance Company of North

19    America (LINA), pursuant to 29 U.S.C. §1132(a)(1)(B), asserting that LINA wrongfully

20    terminated her benefits under her employer's long-term disability plan.  LINA has filed the

21    administrative record (#16).  The parties have agreed to present this matter as a summary

22    bench trial, and they each moved for judgment on the administrative record,

23    submitting opening briefs (## 17, 18), opposing briefs (## 19, 20), and reply briefs (## 21,

24    22).

25         While the Court readily concludes from the administrative record that, in general,

26    LINA appropriately administered the determination whether Brown remained eligible for

1  disability benefits in an appropriate manner, the correctness of its determination whether or

2  not she is disabled, as defined by the plan, presents a closer question.  Having carefully

3  considered the entirety of the administrative record, paying particular attention to

4  documents generated by Brown, her medical providers, other medical professionals who

5  have evaluated her, the Transferrable Skills Analysis, and LINA's letter determining that

6  Brown was not disabled as defined by the plan, and LINA's letter denying Brown's appeal,

7  the Court cannot agree with LINA's determination on November 10, 2011, that Brown did

8  not meet the plan's definition for persons disabled from any occupation.  Accordingly, the

9  Court will grant Brown's motion and deny LINA's motion for judgment.

10  The following constitutes the Court's Findings of Fact and Conclusions of Law.

11  The Court has jurisdiction pursuant to 28 U.S.C. §1331 and the Employee

12  Retirement Income Security Act of 1974, 29 U.S.C. §1132(e)(1).  Venue is proper in this

13  Court pursuant to 29 U.S.C. §1132(e)(2).

14  Brown worked as a reservations manager for VEBA, Inc.  According to the

15  Dictionary of Occupational Titles, a "reservations manager" is a sedentary job.  She

16  stopped working in late August 2006, to undergo surgery to remove a tumor pressing

17  against her brain stem.  After returning to work on February 1, 2007, on a reduced

18  schedule and with restrictions, Brown began suffering an increase in headaches and

19  fatigue, and felt unable to perform her job.  She continued working through August 2, 2007,

20  and has not worked since that time in any occupation.  In December 2008, Brown

21  underwent gamma knife surgery in a procedure related to the medical condition treated in

22  her 2006 surgery.

23  While working for VEBA, Brown was eligible to and did participate in the long-term

24  disability benefits plan offered by VEBA.  LINA was the Claim Fiduciary for the VEBA plan.

25  Pursuant to the VEBA plan:

26

2

[An] Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:

1.    unable to perform the material duties of his or her Regular Occupation; and

2.    unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.

...

[LINA] will require proof of earnings and continued Disability.

On August 3, 2007, Brown made a claim for long-term disability benefits, and provided medical records supporting her claim.  The Court has reviewed all medical records provided to LINA in support of her initial claim.  Among these records was a Medical Request Form completed by Staci Ross, PhD, a neuropsychologist, who diagnosed Brown as having a cognitive disorder secondary to meningioma subsequent to a resection of the meningioma.  Additional factors noted by Dr. Ross impacting Brown's return to work were "Adjustment disorder with mixed anxiety/depression secondary to cognitive decline."  She noted as restrictions that Brown was "[n]ot able to work in high pressured enviroment in a quick manner.  Limiting tasks which require attention to detail, limiting organization, planning, mathematical reasoning, thus impacting mood and ability to work with others."  LINA approved Brown's claim, and Brown began receiving disability benefits beginning January 30, 2008.

Pursuant to the VEBA plan, "[LINA] may reduce the Disability Benefits by the amount of such Other Income Benefits."  "Other Income Benefits include: . . . 2. any Social Security disability or retirement benefits the Employee . . . on his or her own behalf . . . because of his or her entitlement to such benefits."  The VEBA plan further provides:

[LINA] will assume the Employee (and his or her dependents, if applicable) are receiving benefits for which they are eligible from Other Income Benefits. [LINA] will reduce the Employee's Disability Benefits by the amount from Other Income Benefits it estimates are payable to the Employee and his or her dependents.

[LINA] will waive Assumed Receipt of Benefits, except for Disability Earnings for work the Employee performs while Disability Benefits are payable, if the Employee:

1.    provides satisfactory proof of application for Other Income Benefits;

3

2.     signs a Reimbursement Agreement;
3.     provides satisfactory proof that all appeals for Other Income Benefits have been made unless [LINA] determines that further appeals are not likely to succeed; and
4.     submits satisfactory proof that Other Income Benefits were denied.

The VEBA plan further provides that "[LINA] may help the Employee in applying for Social Security Disability Income (SSDI) Benefits. . . . [LINA] will reduce Disability Benefits by the amount it estimates the Employee will receive, if the Employee refuses to cooperate or participate in the Social Security Assistance Program.

With the assistance of LINA (through Advantage 2000 Consultants), Brown filed for Social Security Disability Benefits (SSDB).  The Social Security Administration (SSA) awarded Brown Social Security Disability Benefits on October 17, 2008, with an entitlement start date of February 1, 2008.  The SSA paid Brown retroactive benefits, which Brown then reimbursed to LINA.  LINA reduced the benefits it paid to Brown by an amount equal to the SSDB she was receiving.

The VEBA plan provides that:

After Disability Benefits have been payable for 24 months, the Employee is considered disabled if, solely due to Injury or Sickness, he or she is:
1.     unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
2.     unable to earn 60% or more of his or her Indexed Earnings.
[LINA] will require proof of earnings and continued Disability.

In addition, the VEBA plan provides that "Benefits will end on the earliest of the following dates: . . . 2.  the date [LINA] determines [the Employee] is not Disabled."

In August 2009, LINA notified Brown that, as the definition of disability would change for her on January 30, 2010, it would be determining whether she would continue to be eligible for "any occupation" benefits.  The letter requested that Brown complete an attached Disability Questionnaire and return it, and reminded her to sign and date the authorization allowing LINA to obtain information from Brown's doctors.  The letter concluded, "Once the requested information is received, we will compare your restrictions

4

1   and limitations to your training, education, and work experience."  Beginning in late 2009,
2   LINA contacted Brown's doctors, requesting updated information.

3        On February 9, 2010, LINA sent Brown another letter notifying her that the change in
4   disability definition had occurred on January 30, 2010.  LINA further stated, "At this time,
5   we have not completed our review to determine whether you are disabled from any
6   occupation as required by your contract.  Your benefits will continue until this review is
7   completed and we are able to render a decision."  The letter noted, "Clarification of your
8   restrictions and limitations from Doctors Anson, Morgan, Rowley, and Soffei."  While this
9   statement, standing alone, does not indicate whether LINA had received, or was waiting to
10  receive, further information from these doctors, the context of the letter indicates that LINA
11  was awaiting further information from them.  LINA also informed Brown that "this
12  continuation of benefits does not mean you satisfy the change in definition in Disability.
13  Ongoing payments are not an admission of present or future liability, but are being made
14  as a courtesy to you while we continue to evaluate whether or not you qualify for ongoing
15  benefits."

16       On October 18, 2010, LINA again advised Brown that it was reviewing her eligibility
17  for continued benefits, and instructed her to complete a Disability Questionnaire & Activities
18  of Daily Living form.  On this form, Brown self-reported, in her own words, that she could
19  not work in her own or any occupation because of "depression, anxiety, dizziness, PTSD,
20  loss of cognitive function, light sensitivity, loss of spacial recognition, inability to use the
21  computer more than 20 minutes, inability to multi-task, confusion, chronic fatigue, and short
22  term memory."  She further reported that the primary physical or mental conditions or
23  problems preventing her from working were "no energy or stamina, cannot process info;
24  and cannot remember."

25       Through the early part of 2011, LINA continued to request updated information from
26  Brown's doctors.

1    By letter dated March 21, 2011, LINA informed Brown that it was reviewing her
2    medical records from the medical providers that she had identified, and that [LINA] may
3    find it necessary to obtain additional information on your functional limitations and
4    capabilities.  If further information is needed, we will contact you through our vendor to
5    schedule a [sic] Independent Medical Examination."  LINA informed Brown that her
6    participation in the IME was required, but would be at the expense of LINA.  LINA further
7    indicated that "[t]he results of any examination will be evaluated along with your doctors'
8    medical information to assess whether your current physical abilities are suitable for any
9    type of employment.  Depending on these results, we may require an [sic] Functional
10   Capacities Evaluation (FCE) at a later date, also without cost to you.  Upon our receipt of
11   the IME results, we may provide a copy to your attending physicians for review and
12   comment."

13   In May 2011, one of Brown's medical providers, Miles Morgan, Psy.D., completed
14   LINA's Behavioral Health Questionnaire with respect to Brown.  Dr. Morgan indicated that
15   Brown has a measured cognitive deficit secondary to meningioma.  He further noted
16   "periods of elevations w/sx of anxiety & depression when cognitive functioning declines."
17   He further noted that Brown had been intermittently abusing "ETOH."  Regarding cognitive
18   status, Dr. Morgan noted Brown was able to complete certain tests, though pace was slow.
19   He noted her immediate memory was moderately deficient, and her working memory is
20   moderately to markedly deficient.

21   As psychiatric impairments, Dr. Morgan noted "1. Cognitive D/O, 2. Anxiety &
22   Depression, 3. Alcohol Abuse."  As examples, Dr. Morgan noted Brown "cannot multitask,
23   memory is impaired, cannot sustain focus on electronic media (computer), cannot tolerate
24   bright light or florescent lighting."  He also noted Brown reported mood fluctuations and the
25   use of "ETOH" to modify negative mood.  Dr. Morgan further concluded that he could not
26   determine when Brown could return to work.  He further noted that Brown had completed

6

neuropsychological testing with Dr. Ross several years prior, and that Dr. Ross had

provided specific recommendations in regard to the type of work that Brown could perform.

Dr. Morgan concluded that Brown's cognitive disorder is likely permanent, but that Brown's

"inability to work is <u>not</u> due to the conditions that are being treated @ this office

(depression & anxiety)."

LINA referred Brown to Thomas F. Kinsora, Ph.D, for the independent medical

evaluation.  Brown met with Dr. Kinsora on Sept. 27, and October 6, 2011, for testing in

connection with his independent neuropsychological evaluation.  The Court has carefully

reviewed the entirety of Dr. Kinsora's report, but specifically notes the following, as it

appears to adequately summarize the report:

> Overall, Kimberly does not appear to have any significant cognitive limitations that would impede her ability to successfully engage in occupational activities or academic/vocational training programs. Some mild problems with fine motor control were noted.  She is likely to have mild problems with spatial reasoning and constructional tasks, but these skills do not appear to be a central aspect of her work, and are unlikely to pose a significant functional difficulty for her given her otherwise strong executive skills.  It is likely that she may have subtly inefficient attention, concentration, and cognitive flexibility, but her skills in this area remain grossly intact and in the low average to high average range.  I suspect that she will have somewhat more pronounced attention, concentration, and cognitive flexibility problems when she is stressed, or working in noisy chaotic environments.
>
> Her significant objective complaint with regard to attention, concentration, and memory were not evident in testing, but are certainly plausible given her medical history and given the psychological/adjustment issues that she is experiencing.  With the exception of her subjective reports of ongoing pronounced fatigue, excessive sleep, and light sensitivity, there is nothing in her cognitive performance that would suggest a significant barrier to engagement [sic] occupational activities, or vocational retraining.  However, it is likely that her depression and anxiety are decreasing the efficiency of her cognitive functioning.

Dr. Kinsora also stated, in response to a question regarding motivation and secondary

gain, that:

> Kimberly appears to long for the day that she can work again, yet her psychiatric issues cause her to lack confidence in herself, and effectively keep her in limbo with regard to returning.  Her failure to return does not appear to be significantly influenced by secondary gain.  She seems to have

created a belief system around her cognitive skills that is simply not supported by her performance on todays [sic] testing.  She has lost all interest in her previous life pursuits and has retreated from her social support network.  To Kimberly, the high functioning professional that she used to be is so far away that she seems unreachable.  She retreats, and sleeps excessively, to avoid thinking about how hard she will have to work to get back to where she was.  Unfortunately, she has made no earnest attempt to rebuild her work skills.  Likewise, she has little confidence in the idea that she could, with assistance rebuild her work skills to the point that returning to gainful employment might be possible.

Dr. Kinsora noted that, regarding Brown's ability to perform repetitive work, "her marked fatigue, low endurance, and hypersensitivity to light will likely be a functional barrier for her in accomplishing repetitive work effectively.  If given sufficient breaks, support in building her stamina, and accommodations with regard to low lighting, she may be able to perform these tasks more effectively." He also noted that Brown's "fatigue, frustration, and irritability are likely to make her far less efficient under stressful conditions.  She will likely behave less rationally, and interact in a more abrasive manner.  Likewise, anxiety may be an issue as stress increases."  Regarding Brown's ability to perform to set limits, tolerances, or standards, Dr. Kinsora stated: "Skills in this area appeared to be intact, as long as she is provided with adequate accommodations to adjust for her fatigue, light sensitivity, and eye strain (when she is asked to read or work on the computer for extended periods of time). She also reports syncope episodes multiple times per day, and may feel dizzy and shaky when she gets up.  She will likely need accommodations for managing these in order to ensure optimal workplace safety."  Dr. Kinsora also that Brown "may have mild problems with multitasking, and these problems will likely be exacerbated by frustration and irritability."  Finally, Dr. Kinsora assigned Brown a Global Assessment of Functioning (GAF) score of 50.

LINA forwarded a copy of Dr. Kinsora's report to Dr. Morgan, who responded by indicating he agreed with the findings.

1    On October 31, 2011, a Transferable Skills Analysis was performed by Vince Engel.

2   In his analysis, Engel states that "[l]imitations and restrictions are taken solely from the

3   Neuropsychological Evaluation performed by Thomas Kinsora, Ph.D. dated 10/17/11.  Dr.

4   Kinsora limits Ms. Brown in the areas of performing repetitive work due to marked fatigue,

5   performing under stress, and to some extent dealing with people beyond giving and

6   receiving instructions.  Dr. Kinsora indicates that she demonstrates quite strong executive

7   skills overall, but may have trouble multi-tasking."  Engel noted Brown's Indexed Earnings

8   as $3,964.26, and the wage requirement as $2,378.56.  After identifying Brown's

9   transferrable skills, Engel identified six occupations that Brown could perform, including

10  Brown's original own occupation of reservations manager ($3,964), as well as general clerk

11  ($2,515) and real-estate clerk ($2,515).

12    By letter dated November 10, 2011, LINA informed Brown that it had determined

13  that she no longer met the definition of Disability as to any occupation.  LINA indicated that

14  it had considered, in its review, Dr. Morgan's Behavioral Health Questionnaire, the medical

15  records provided by Dr. Anson for 2006-2009, the medical records provided by Dr. Rowely

16  for November 2009 through January 2011, Brown's Disability Questionnaire, and Dr.

17  Kinsora's neuropsychological evaluation.  LINA further indicated that it had a transferrable

18  skills analysis performed which identified six occupations that take most advantage of

19  Brown's skills, education, and abilities, as well as meeting the wage replacement

20  requirement.  LINA closed her Brown's long-term disability claim as of November 10, 2011.

21    Brown appealed LINA's decision, submitting additional medical records from Dr.

22  Rowley, and a letter prepared by Dr. Morgan in response to an inquiry from her counsel.

23  Brown argued (1) that the transferable skills analysis failed to fairly consider the

24  accommodations and retraining noted by Dr. Kinsora, (2) the transferable skills analysis

25  did not account for the restrictions and limitations in determining the earnings test for any

26  occupation, (3) LINA did not acknowledge or discuss the impairments recognized by a GAF

1   score of 50, (4) LINA failed to consider that the SSA had awarded disability benefits to

2   Brown, (5) LINA failed to advise Brown of the additional information or material she

3   required for her appeal, and the reason the information was necessary, and (6) LINA's

4   termination letter failed to incorporate Brown's subjective statements from her Disability

5   Questionnaire.

6       LINA referred Brown's file for staff medical review to Richard Hall, M.D.  Dr. Hall

7   stated that Dr. Rowley's records were "devoid of any documented, significant, quantified,

8   positive neurologic finding or physical impairment."  He also stated that Dr. Morgan's

9   conclusions were "not supported."  Dr. Hall also noted Dr. Kinsora's finding that Brown had

10  "no significant cognitive limitation."

11      LINA's Behavioral Health Specialist, Carol Flippen, M.D., reviewed Brown's file.  She

12  opined that the provided medical information for Brown did not support a functional mental

13  impairment subsequent to November 11, 2011.

14      On July 25, 2012, LINA denied Brown's appeal.

15      Brown then brought the instant suit.

16      This Court reviews *de novo* LINA's determination that Brown does not meet the

17  definition of Disability for any occupation.  Pursuant to the plan, "[LINA] will pay Disability

18  Benefits if an Employee becomes Disabled while covered under this Policy.  The Employee

19  must satisfy the Elimination Period, be under the Appropriate Care of a Physician, and

20  meet all the other terms and conditions of the Policy.  He or she must provide [LINA], at his

21  or her own expense, satisfactory proof of Disability before benefits will be paid."  The policy

22  lacks any other language indicating that LINA has discretion in deciding claims.  The

23  language that is used in the plan does not unambiguously confer discretion on LINA to

24  decide claims.  The Summary Plan Description does have language that unambiguously

25  confers discretion on LINA in deciding claims.  The terms of a plan cannot be modified by a

26  summary plan description.  *Cigna Corp. v. Amara*, 131 S.Ct. 1866, 1877-78 (2011).

10

Further, the SPD itself provides that it is not the insurance contract, that it does not alter or waive any term of the policy, and that the policy governs.  Accordingly, the Court will review LINA's administration of Brown's claim *de novo*.

The Court is cognizant that the Social Security Administration awarded Brown disability benefits in 2008.  A disability determination by the SSA does not establish, and has never been recognized as establishing, whether a person is disabled pursuant to the terms of an ERISA long-term disability plan.  LINA was not precluded, by the SSA award of disability benefits to Brown, from initiating its effort to determine whether Brown was disabled for "any occupation."  Nor was LINA compelled to conclude that, because Brown had been awarded SSDB, that she was disabled for any occupation.  Rather, LINA was obligated to review whether, at any point subsequent to January 2010, Brown was unable to perform the material duties of any occupation that would earn her 60% of her indexed earnings.  The administrative record indicates that LINA was cognizant of the SSA award of disability benefits.  As indicated by LINA in its letter denying Brown's appeal, the clinical information supporting the SSA award was not delineated, and there was not an SSA opinion explaining its basis for awarding disability benefits.  LINA further indicated that it reached its determination independent of the SSA, and by reviewing medical information generated after the SSA award.  The administrative record presented to this Court includes Dr. Kinsora's evaluation of Brown's cognitive functioning based on objective testing in September and October 2011, Dr. Morgan's agreement with the findings of Dr. Kinsora's evaluation, and Dr. Morgan's written letter of May 2012, and the medical records provided by Dr. Rowley. The administrative record, including LINA's letter denying Brown's appeal, establishes that it reviewed and considered these materials that were not available to the SSA.

The administrative record indicates that LINA considered Brown's subjective reports of her perceived limitations and restrictions.  Dr. Kinsora's evaluation summarized Brown's

subjective reports.  The evaluation noted that Brown's subjective complaints were not

evident from the objective testing.  Nevertheless, Dr. Kinsora did not outright dismiss her

subjective reports merely because they were not revealed in the objective testing, but he

instead recognized that her complaints were "plausible given her medical history and given

the psychological/adjustment issues she is experiencing."  He further noted that "with the

exception" of Brown's subjective complaints of ongoing pronounced fatigue, excessive

sleep, and light sensitivity, he opined that "there is nothing in her cognitive performance

that would suggest a significant barrier to engagement in occupational activities, or

vocational retraining."  Dr. Flippen's medical review specifically noted Dr. Kinsora's report

that Brown would have some problems with attention and concentration in stressful, noisy

or chaotic environments.

Against Brown's subjective reports, Dr. Flippen also noted the objective components

of Dr. Kinsora's evaluation.  His testing revealed that Brown had some cognitive limitations,

but he opined that she did not have significant cognitive limitations that would impede her

ability to engage in occupational activities or academic/vocational programs.  Dr. Kinsora

does not indicate or suggest that Brown lacks any cognitive limitation, nor would such a

conclusion be consistent with the objective results of his testing.  Dr. Kinsora does not

recommend vocational retraining, or indicate that Brown can engage in occupational

activities only after receiving vocational retraining.  Rather, he concludes that she lacks

cognitive limitations sufficiently significant that would impede her from engaging in either

these retraining activities or occupational activities.

Dr. Morgan had an opportunity to review Dr. Kinsora's evaluation, and did not

disagree with its findings.  In a letter to Brown's counsel, Dr. Morgan indicated he would not

disclose Brown's medical records.  Dr. Morgan's letter lacks any result of objective testing.

He opined that Brown could maintain employment but added his belief that she must be

retrained in a profession or career that allows significant accommodations given her

1  documented medical and cognitive limitations.  In the single paragraph addressing the

2  issue, Dr. Morgan does not specifically identify Brown's documented medical and cognitive

3  limitations, does not provide any indication of what significant accommodations he believes

4  are required for those limitations, and does not provide any indication of what careers or

5  professions he believes will allow these significant accommodations.  More critically, while

6  Dr. Morgan's opinion rests upon a foundation that Brown cannot return to work without

7  retraining, he does not identify how he reached that or, if Brown could work in some

8  occupations without retraining, why such occupations would not provide the significant

9  accommodations he believes were required.

10        Dr. Kinsora assigned Brown a score of 50 for the DSM-IV Axis V Global Assessment

11  of Functioning.  Dr. Morgan assigned Brown an GAF score of 60.  In her medical review,

12  Dr. Flippen indicated that GAF score of 50 is appropriate for someone who is at the higher

13  end of functioning for an individual with serious limitations in social or occupational

14  functioning.  Dr. Flippen's review also indicates, however, that the GAF score is a clinician's

15  judgment "of the individuals [sic] overall functioning taking into account symptom severity

16  and psychological, social, and occupational functioning."  In his evaluation, Dr. Kinsora

17  noted that Brown "seems to have created a belief system around her cognitive skills that is

18  simply not supported by her performance on today's testing."  He further noted that "[s]he

19  retreats, and sleeps excessively, to avoid thinking about how hard she will have to work to

20  get back to where she was."  As also indicated by Dr. Kinsora, Brown has beliefs and

21  psychiatric issues that cause her to lack confidence in herself.

22        Also before the Court is Engel's Transferable Skills Analysis, a one-page document.

23  The document identifies a set of transferable skills and six occupations that Engle

24  concluded Brown could perform.  Though not stated expressly, the analysis indicates that

25  the material duties of each of the six occupations identified by Engle are common to

26  Brown's transferable skills.  At a minimum, the Analysis identifies six occupations, each of

1   which exceed the earnings test, that a person with Brown's skills could perform.  The

2   Analysis recites that Brown's limitations and restrictions are taken solely from Dr. Kinsora's

3   evaluation.  Though not stated expressly, the Analysis can be construed as a determination

4   by Engle that each of the six identified occupations could be performed by a person with

5   the necessary skills but who is limited in the abilities of performing repetitive tasks due to

6   marked fatigue, limited in performing under stress, and limited to some extent in dealing

7   with people beyond giving and receiving instructions.  The Analysis does not provide any

8   further explanations in support of its determinations.

9          The Court agrees with Brown that Engle's analysis is insufficient as a basis to

10  conclude that the identified occupations could be performed with the accommodations

11  Brown would require while still allowing a person to earn 60% of Brown's indexed earnings.

12  While Dr. Kinsora identified Brown had functional barriers in the areas of repetitive work,

13  performing work under stress, dealing with other people, and multitasking, he also noted

14  the impact of Brown's fatigue, depression, anxiety, frustration, irritability, subtly inefficient

15  attention and concentration, light sensitivity, eye strain (when working on electronic media)

16  on other functions.  He also repeatedly noted the need for accommodations.  "If given

17  sufficient breaks, support in building her stamina, and accommodations with regard to low

18  lighting, she may be able to perform these tasks more effectively." He also noted that

19  Brown's "fatigue, frustration, and irritability are likely to make her far less efficient under

20  stressful conditions.  She will likely behave less rationally, and interact in a more abrasive

21  manner.  Likewise, anxiety may be an issue as stress increases." Regarding Brown's

22  ability to perform to set limits, tolerances, or standards, Dr. Kinsora stated: "Skills in this

23  area appeared to be intact, as long as she is provided with adequate accommodations to

24  adjust for her fatigue, light sensitivity, and eye strain (when she is asked to read or work on

25  the computer for extended periods of time).  In sum, Dr. Kinsora did not merely recognize

26  limitations for Brown as to repetitive work and performing under stress, but recognized that

14

Brown's ability to adequately and consistently perform many functions depended on her receiving accommodations.  Thus, while Brown's ability to direct, control and plan remained intact, Dr. Kinsora also acknowledged that her effectiveness in this area may be limited. Similarly, while agreeing that Brown could perform with the demands of precise attainment of set limits, tolerances or standards, he conditioned his response with a condition that she be provided accommodations for light sensitivity, eye strain, and fatigue.

In addition, while it is not surprising that Engle's Analysis identifies reservations manager as an occupation that Brown had the skills and experience to perform, his analysis assigns a 100% earning value to this occupation.  In her appeal, Brown specifically raised the sufficiency of Engle's Analysis in her first two issues, and in the second of those issues she specifically pointed out that the first requirement for working as a reservations manager for VEBA was to work quickly in a high-pressure environment and ability to handle stress.  Brown noted she could not perform the duties of this job, given that she had attempted but was unable to successfully return to work.  Given the lack of credibility in Engle's identification of reservations manager at 100% earnings, the value of his Analysis becomes suspect.

Although LINA placed significant reliance on the Transferable Skills Analysis in its original determination that Brown was not disabled, LINA's letter denying Brown's appeal contains only a single sentence concerning the Analysis.  That sentence indicates only that the Analysis was performed based upon the limitations identified in the IME and Brown's self-reported education and work history.  LINA's letter denying the appeal does not respond to the issues raised by Brown in her appeal concerning the analysis, and does not defend Engle's determination that Brown could perform the identified occupations and earn at least 60% of her indexed earnings, or Engle's implicit determination that Brown could earn 60% of indexed earnings in an occupation providing accommodations for Brown's limitations.

1    Indeed, it is notable in reviewing the letter denying the appeal that, other than

2    quoting the disability definition, the letter does not address the issue whether Brown was

3    able to perform the material duties for any occupation for which she was qualified based on

4    education, training or experience and earn 60% of her indexed earnings, and achieve that

5    earnings level in light of Dr. Kinsora's repeated recognition of the need for certain

6    accommodations.  The Court could speculate that Brown could find employment as a

7    reservations manager at a salary level reflecting necessary accommodations for her

8    limitations and still be paid 60% of her indexed earnings.  The administrative record,

9    however, does not support that speculation.  Rather, at most, the administrative record

10   supports the same conclusion that LINA reached and stated in its letter denying Brown's

11   appeal: Brown had an "ability to perform the material duties of any occupation."

12   That Brown could work in any occupation, however, does not establish that she was

13   disabled as defined by the plan.  A significant difference exists, between "any occupation"

14   and any occupation (1) for which an employee is qualified, and (2) for which an employee

15   can earn at least 60% of her indexed earnings.  Of necessity, the 60% earnings test

16   encompasses and reflects a determination that such salary would be paid while

17   accommodating any limitations imposed by the injury.  The administrative record before the

18   Court does not support a determination that Brown was disabled as that term is defined in

19   the plan for employees who have already received disability benefits for 24 months.

20   Therefore, for good cause shown,

21   THE COURT **ORDERS** that Defendant's Motion for Judgment on the Pleadings and

22   Administrative Record (#17) is DENIED;

23   THE COURT FURTHER **ORDERS** that Plaintiff's Rule 52 Motion for Judgment on

24   the Pleadings and Administrative Record (#18) is GRANTED.

25   THE COURT FURTHER **ORDERS** that Plaintiff shall, within seven days of the entry

26   of this Order, prepare and submit a proposed judgment.  Defendant may, if it so decides,

1   file any objection to the proposed judgment not later than seven days after it is filed by the

2   plaintiff.  The plaintiff may, if she so decides, file a reply to defendant's objection not later

3   than three days after it is filed.

4

5   DATED this _____ day of March, 2014.

6

7                                                    _____
                                                     Lloyd D. George
8                                                    United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26